UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AARON CLARK,

                            Petitioner,                      Case Number 2:10-CV-13857
                                                  Honorable Victoria A. Roberts

v.

CATHERINE BAUMAN,

                            Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS

This matter is before the Court on Petitioner Aaron Clark's petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254. Petitioner was convicted after a bench trial in the Wayne Circuit Court of two counts of first-degree criminal sexual conduct. MICH. COMP. LAWS § 750.520b(1)(h)(i). He was sentenced on August 13, 2007, to two concurrent terms of 18-to-30 years. The petition raises four claims: (1) The trial court was biased and prejudiced against Petitioner; (2) Petitioner was denied the effective assistance of trial and appellate counsel; (3) the trial court's verdict was against the great weight of the evidence; and (4) the prosecutor failed to provide discovery materials to the defense. The Court finds that Petitioner's claims are without merit. Therefore, the petition is denied. The Court also denies Petitioner a certificate of appealability and denies permission to proceed on appeal informa pauperis.

### I. Facts and Procedural History

DB, the seventeen-year-old moderately retarded daughter of Petitioner, testified at his trial that she resided at Manor. Manor is a residential treatment facility for mentally and emotionally impaired children.

During Easter weekend of 2007, DB was staying with her grandmother at her house in Detroit. In the early morning hours of Easter morning, she woke up on the couch with her clothes removed and felt that she was being anally raped. She did not see who was raping her but knew it was her dad because he was the only man in the house except for her brother. She felt her anus being penetrated twice and her vagina once.

After the incident, DB testified that she went to the bathroom and then woke up her little sister, Mia, and told her what happened. The next morning, Petitioner took DB, Mia, and her brother, Aaron, to the store. Petitioner gave each of the children money. When they returned to her grandmother's house, DB started screaming that she had been in the system too long and that she had just been raped.

Dr. Anthony Gensterblum, testified that he was the treatment director at Manor. He testified that DB had an IQ of 53, which put her in the range of moderately mentally retarded. He testified that DB was living in transitional housing at Manor with another girl, and would not be ready for another year or two to be moved to a less restrictive environment. DB was prescribed 900mg of Seroquel for anger management, which was an "especially high" dose, and Depakote for mood stabilization. He did not believe that her mental condition caused her to hallucinate, though. He testified that DB had previously suffered from a psychotic incident when she scalded her sister Mia in a hot bathtub. That incident resulted in her admission into treatment.

On cross-examination Dr. Gensterblum testified that DB had been diagnosed as schizo-affective, but that diagnosis had since been dropped. He testified that DB did not have any psychotic episodes at the facility, but that could be the result of the Seroquel.

Mia Clark, testified that she was DB's eight-year-old sister. She was in third grade at the

Henry Ford Academy.  She testified that on the morning of the incident, her father, Petitioner, offered her five dollars to "feel her butt."  Mia testified that on that same morning they had gone shopping with Petitioner and had a good time.  At some point during the morning, DB and Mia were in the bathroom, and DB told Mia that she had been raped.  Mia went to tell her brother, Aaron, but Petitioner followed them.

Aaron Clark IV, Petitioner's son, testified that he was with his sisters at their grandmother's house for Easter in 2007.  He stayed up until about 5:00 A.M. watching movies with Petitioner.  DB came into his bedroom early in the morning and tried to wake him up.  Later, DB came back crying with Mia and his dad was following them.  Just before the police came, DB said that she had been awoken by Petitioner when he put his penis in her butt.

Nakita Banks testified that she was the oldest sister in the family, but she was not Petitioner's daughter.  She drove DB to Petitioner's mother house late Saturday night before Easter. Nakita testified that she gave DB her medications at the set times on Saturday.  She gave Petitioner DB's medications for Sunday.  Nakita was in the process of adopting her sister Mia.

On cross-examination, Nakita acknowledged that a Department of Human Services report alleged that an inappropriate sexual contact had occurred between one of Nakita's male friends and DB.  Nakita testified that DB had alleged that the man had offered to give DB five dollars to touch her butt.  Nakita did not know if the allegations were true, but she admitted that during the time period of that investigation she was not allowed to have unsupervised visitations with DB.

Petitioner's sister, Wenoia Clark testified that she helped calm DB down at the hospital.  She saw DB sit straight up on a hard surface.  Clark explained that she had once been anally raped, and it was so painful that she doubted that DB would have been able to sit up straight if the allegation

-3-

were true.  Clark opined that her brother was a good father, but suggested that his son Aaron, might have been the perpetrator since he had pent up anger because Petitioner was in prison during most of his childhood.

A Detroit Police Officer testified that when he arrested Petitioner, who appeared to be hiding in the basement of another house, Petitioner said: "You might as well take me to prison now. I don't need a trial."

Petitioner's mother, Barbara Clark, testified that she went to church on Easter morning at about 5:30.  Her youngest son, Andre Clark, was awake when she left.  When she returned from church at about noon, DB told her that Petitioner had raped her.  Petitioner and her grandson Aaron were fighting and the house was being torn up.  She locked her son in the basement, and told the others to take DB to the doctor.  She heard Petitioner yell up from the basement that he would go back to prison because he had not registered on the sex offender registry.

Petitioner's sister, Wanda Clark, testified that her brother was a good father.  She testified that a few years previously, Nakita's boyfriend had offered DB five dollars to touch her butt, and that because Mia was now making the same allegation, she did not believe it.

Petitioner testified in his own defense.  He testified that he stayed up with his son until about 5:00 A.M. on Easter morning watching movies.  He woke his mother up to go to church.  He testified that the girls woke up and that they all went to the store at about 8:00 or 9:00 A.M.  He gave money to the kids, and they were all having a good time.  Petitioner explained that when they returned to his mother's house, DB started acting strange.  He had forgotten to give DB her medicine that morning.  He got into a fight with his son, and Nakita punched him in the eye.  He was unaware at the time of the accusations that DB was making against him.

-4-

Following closing arguments, the trial court made its findings of fact.  The court found that there was no evidence that the absence of medication caused DB to imagine the incident.  It noted that DB's hysterical or psychotic conduct at the hospital could have been the result of the traumatic incident.  While recognizing the inconsistencies in her testimony, the court found DB to be a credible witness, stating:

> [F]rom the very beginning she has consistently said that she was anally penetrated and vaginally penetrated by her father and I found her to be an enormously credible witness in spite of her infirmities.
>
> She was, and continues to be, angry about what happened to her and she expresses that anger in her own articulate way and she had consistently indicated that she was violated by her father.
>
> There have been some details that were at variance at different times during the time that she's told of this, but there's also the fact that by all accounts, by the family members witnesses, as well as the medical records, she was in a state of utter and total hysteria right after this happened and there is not other explanation for what caused her to explode.

T 8/13/07 at 26.

The court went on to find that Mia was also a credible witness, and it believed Mia's testimony that Petitioner propositioned her on the same morning of the incident:

> I mean the girl was an astonishingly good witness and very credible and articulate and convincing and she said her father, in a sense, propositioned her for sex just moments before he jumped [DB] and that's not only convincing and credible evidence, it's also relevant because it shows that the Defendant was – I mean, he woke up a horny little devil that morning and he was going to get it somewhere as easy as he could and by [DB] and Mia's testimony there was nobody else awake or walking around when all of this happened.

Id. at 29.

The trial court found that Petitioner's statement to the arresting police officer that he should take him directly to prison was evidence of Petitioner's consciousness of guilt.  The Court did not

-5-

believe Petitioner's testimony that he did not know at the time DB accused him of raping her.  The Court furthermore was not convinced by the defense's challenges to the credibility of the prosecution witnesses or the allegation that the charges resulted from a fabricated plot: "[The defense] makes some decent points, but they don't cause me to have reasonable doubt here."  Id. at 30.  The Court found that DB was not capable of being led into such a plot and that her behavior at the hospital undermined the defense.

The Court then found Petitioner guilty of both counts of first-degree criminal sexual conduct. Petitioner was subsequently sentenced to 18-to-30 years in prison.

Following sentencing, Petitioner appealed his conviction to the Michigan Court of Appeals. His appellate brief raised the following claims:

> I. The defendant was denied his state and federal rights of due process where the prosecutor failed to comply with the discovery order and the court failed to adjourn the trial date so that the defense could receive the discovery necessary to mount its defense.
>
> II. The defendant was denied due process and equal protection under the law as guaranteed by the U.S. Constitution and the Constitution of the State of Michigan when his conviction was against the great weight of the evidence.
>
> III. The defendant's sentence was not individualized and was therefore invalid.

The Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *People v. Clark*, 2009 Mich. App. LEXIS 327 (Mich. Ct. App. Feb. 12, 2009).

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, which raised the following three claims:

> I.  The verdict of the trial court was against the great weight of the evidence.
>
> II.  The trial court was biased because had presided in the family court case involving DB's abuse of Mia.

III. Appellate counsel was ineffective for failing to raise an ineffective assistance of trial counsel claim.

The Michigan Supreme Court denied the application in a standard order. *People v. Clark*, 483 Mich. 1114 (2009) (table).

Petitioner then filed the instant application for habeas relief, raising the following four claims:

I. Bias and Prejudice of Trial Court

II. Ineffective Assistance of Trial Counsel and Appellate Counsel

III. [The Verdict Was Against The] Great Weight of the Evidence

IV.[Failure to Provide] Discovery

## II. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable

application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the

authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*, at 786-787.

## III. Analysis

### A. Exhaustion

Respondent asserts in its answer that several of Petitioner's claims were not fully exhausted in the state courts, and the petition is therefore subject to dismissal.

A petition for writ of habeas corpus "shall not be granted" unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). A petitioner properly exhausts his claims by "fairly presenting his federal claims to the state courts." *Jells v. Mitchell*, 538 F.3d 478, 488 (6th Cir. 2008) (citation omitted). The exhaustion requirement "is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Id.*

While exhaustion requires that the petitioner present his claims to the state's highest court, presenting his claims to only the state's highest court may not suffice. The Michigan Supreme Court conducts discretionary review of appeals by application for leave to appeal. In *Castille v. Peoples*,

-9-

489 U.S. 346 (1989), the United States Supreme Court held that presentation of an issue for the first time on discretionary review to the state's highest court does not satisfy the "fair presentation" requirement where the court declines to exercise its discretion to review the matter. *Id*. at 351. Applying *Castille*, the Sixth Circuit has likewise determined that the exhaustion requirement is not satisfied where a petitioner first presents a claim on discretionary appeal to the state's highest court, unless that court opts to review the merits of the claim. *See, e.g., Granger v. Hurt*, 215 Fed. Appx. 485, 491 (6th Cir., Feb. 8, 2007).

Petitioner's first and second habeas claims were presented to the Michigan Supreme Court, but they were not presented to the Michigan Court of Appeals. They are therefore unexhausted under *Castille*. Petitioner's fourth claim was presented to the Michigan Court of Appeals, but not the Michigan Supreme Court. It is therefore also unexhausted. While the failure to exhaust these three claim presents a sufficient basis to dismiss the petition, the Court will nevertheless address his claims because they may be denied on the merits for the reasons articulated below. See 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

**B. Trial Court Bias**

Petitioner first claims that the trial judge was biased against him. He notes that several years prior to his trial, the trial judge presided in the case arising out the incident when DB scalded Mia in the bathtub.

Petitioner had a constitutional right to a hearing before an unbiased judge. *Bracy v. Gramley*, 520 U.S. 899, 904-905 (1997). But a judge's misconduct "may be 'characterized as bias or

-10-

prejudice' only if 'it is so extreme as to display clear inability to render fair judgment,' so extreme in other words that it 'display[s] a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Lyell v. Renico*, 470 F.3d 1177, 1186 (6th Cir. 2006) (quoting *Liteky v. United States*, 510 U.S. 540, 551, 555 (1994)).

The record in this case does not reflect that the trial court was unable to render a fair judgment or that it was unfairly antagonistic toward Petitioner. At the hearing where Petitioner waived his right to a jury trial a brief record was made of the fact that the trial judge (Wayne County circuit judge Michael M. Hathaway) was the family court judge assigned to the case where DB, as a juvenile, had scalded her younger sister Mia. T 8/1/07 at 6. The judge indicated that he did not remember the victim, the previous proceeding occurred at least five years earlier, and it made no difference to him in judging the victim's credibility or anything else. Id. at 7. The trial court then asked defense counsel if he had anything to say, and he said he did not. Id.

Nor is there anything in the trial record that suggests the court was biased against Petitioner. The court's findings of fact following the trial indicate that he fairly and conscientiously considered the case and rendered a decision based on the evidence presented at trial. Therefore, Petitioner has failed to demonstrate that he was denied his right to be trial before an unbiased judge.

## C. Ineffective Assistance of Counsel

Petitioner's second claim asserts that he was denied the effective assistance of counsel. Specifically, Petitioner asserts that his trial counsel failed to move to dismiss the charges after the preliminary examination in light of the fact that there was no physical evidence presented that DB had been raped. He also asserts that his trial court should have more forcefully argued at trial that the lack of physical evidence created a reasonable doubt, and he should have moved to remove the

-11-

trial judge on the grounds that he presided over DB's earlier case. Finally, Petitioner asserts that his appellate counsel was ineffective for failing to raise these claims during his direct appeal.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. The Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688; internal quotes omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

Petitioner first asserts that his counsel was ineffective for failing to move to dismiss the

charges after the preliminary examination when no physical evidence was offered to show that DB

was raped.  At the preliminary examination DB testified that Petitioner penetrated her anally and

vaginally with his penis:

> [F]irst he did the butt and then he did the cootchee part.  He stopped and stopped, did
> the butt, then did the cootchee part and then he stopped and then he stopped, then he
> thought somebody was coming and then ain't nobody come, so he did it again.

PE, at 37.

Defense counsel did not oppose the prosecutor's motion to bind the case over for trial, stating

simply: "Question of fact, Judge." PE Tr. at 39.  Michigan law specifically provides that in criminal

sexual conduct prosecutions, the testimony of a victim need not be corroborated by other evidence.

MICH. COMP. LAWS § 750.520h; *People v. Szalma*, 487 Mich. 708, 724 (2010) (complainant's

testimony can, by itself, be sufficient to support a conviction of criminal sexual conduct).

Accordingly, the fact that no physical evidence was offered at the preliminary examination to

support the charges did not support dismissal.  Counsel was not ineffective for failing to make a

frivolous motion.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010).

Petitioner next argues that his trial counsel was ineffective for not more forcefully arguing

that the absence of physical evidence created a reasonable doubt.  Counsel did, in fact, argue that

the lack of physical evidence was important:

> The testimony of the hospital shows that there were no injuries.  Now, this was a
> forced penetration of the anus.  The hospital records, the defendant's exhibit, patient
> has normal external female genitalia and normal labia majora, normal labia minora.
> Introitus is normal appearance.
>
> Hymen is redundant and there is no evidence of any laceration or bruises to
> the introitus.  Patient is in Tanner stage IV.  That has to do with the maturity.  Anus
> is normal appearance on external exam.
>
> That's your hospital records.  Also, Judge, look at the hospital records.  No

-13-

indication that she was expressing pain.  Now, this was something that Nakita testified to that she was in terrible pain.  Hospital records don't support terrible pain. Nothing.

If there was terrible pain you got to believe that these would be identified in the records.  Also she said that [DB] threw up in the hospital.  This was not in the records.  I searched the records.  Not in the records.

T 8/13/07, at 17.

The theory of the defense was that DB was a very troubled child who was not given medicine required to avoid psychotic episodes, and that as part of a dysfunctional family she lashed-out psychotically when she discovered her sister Nakita was in the process of adopting Mia.  Defense counsel very strongly presented this defense to the Court.  In fact, in making its findings of fact, the trial court remarked:

I don't recall that I've ever presided over a trial where a defendant was – and I say this in all honesty – as ably defended in the face of plain allegations from the victim herself and some other supporting evidence.

I don't recall that I've ever presided over a case that was as ably defended. I mean, Mr. Surowiec points out a lot of the kind of problems that are almost sort of inevitable in a case like this and suggests that they should give the trier of fact reasonable doubt that the event occurred the way they're alleged.

Id., at 24.

This Court agrees with that assessment.  Trial counsel was vigorous in his defense of Petitioner and effectively presented Petitioner's theory of the case at trial.  This included making a forceful argument regarding the absence of physical evidence.  Despite the defense, the trial court chose to believe the testimony of the victim and found Petitioner guilty.  Petitioner has not demonstrated that his counsel's trial performance was deficient; nor has he shown that there is a reasonable probability that the result would have been more favorable if counsel said more about a lack of physical evidence.

-14-

Petitioner also says that his counsel was ineffective for failing to challenge the trial court's impartiality. As discussed above, any such challenge would have been futile because there is no evidence that the trial court was biased against Petitioner or that such a request would have been granted.

Finally, Petitioner asserts that his appellate counsel was ineffective for failing to raise a challenge to his trial counsel's effectiveness on direct appeal. Counsel's failure to raise an issue on appeal constitutes ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the outcome. *See Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005). Failing to raise a meritless claim that has no chance of succeeding does not constitute ineffective assistance of appellate counsel. *See Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). The Court has decided that Petitioner's ineffective assistance of trial claim lacks merit. It follows that appellate counsel's failure to raise the issue was neither unreasonable nor prejudicial, and therefore, does not satisfy the requirements under *Strickland*.

**D.  The Great Weight of the Evidence**

Petitioner's third claim is that he is entitled to a new trial because the great weight of evidence ran against the trial court's verdict. In particular, Petitioner points to the lack of physical evidence and asserts that DB was not a credible witness.

A federal habeas court has no power to grant habeas relief on the ground that a state conviction is against the great weight of evidence. *Cukaj v. Warren*, 305 F. Supp. 2d 789, 796 (E.D. Mich. 2004); *See also Artis v. Collins*, 14 Fed. Appx. 387 (6th Cir. 2001)(declining to grant certificate of appealability to habeas petitioner on claim that jury's

-15-

verdict was against the manifest weight of the evidence).

To the extent Petitioner challenges the sufficiency of the evidence to convict him, he is not entitled to habeas relief. "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). But, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). This inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. at 318-19(internal citation and footnote omitted)(emphasis in the original).

More importantly, a federal habeas court may not overturn a state court decision which rejects a sufficiency of the evidence claim, simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith*, 132 S. Ct. 2, 4, 181 L. Ed. 2d 311 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id*. Indeed, for a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable

as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S.Ct. 2060, 2065, 182 L. Ed. 2d 978 (2012).

Here, there was sufficient evidence to convict Petitioner. The victim testified that Petitioner penetrated her anus and vagina with his penis. Her testimony was corroborated by her hysterical conduct after the incident and at the hospital, and by her younger sister's testimony that Petitioner had propositioned her prior to the assault on the victim. The trial court, sitting as finder of fact, chose to believe this testimony. Attacks on witness credibility are simply challenges to the quality of the prosecution's evidence, and not to the sufficiency of the evidence. *Martin v. Mitchell*, 280 F. 3d 594, 618 (6th Cir. 2002). An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. *Gall v. Parker*, 231 F. 3d 265, 286 (6th Cir. 2000).

Petitioner is not entitled to habeas relief on his first claim. The decision of the trial court was not so insupportable as to fall below the threshold of bare rationality. The claim is therefore without merit.

## E.  Failure to Provide Discovery

Petitioner's final claim asserts that he was denied access to records from Manor, where the victim lived for about seventeen months prior to the incident. According to Petitioner, the records might have indicated that the victim had psychotic episodes at Manor, which would have made it more likely that her accusations against Petitioner resulted from a psychotic episode.

To the extent Petitioner contends that the prosecutor violated state discovery rules, his claim is not cognizable for purposes of federal habeas corpus review. *See Lorraine v.*

-17-

*Coyle*, 291 F.3d 416, 441 (6th Cir. 2002). Petitioner also is unable to establish a violation of his federal due process rights. Under *Brady v. Maryland*, 373 U.S. 83 (1963), "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court has held that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 281 (quoting *Bagley*, 473 U.S. 667, at 682); *see also Cone v. Bell*, 556 U.S. 449 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

Shortly before trial, defense counsel claimed that the prosecution failed to provide all psychiatric and group home records relating to the victim. See T 8/2/07, at 9-10. He claimed that these documents were needed to support his theory that the victim's allegations were the result of her psychosis and not related to Petitioner's actions. Id. The prosecutor argued the victim's psychiatric records were privileged and were only discoverable if Petitioner demonstrated a good faith belief grounded in articulable fact that there is a reasonable probability that records protected by privilege are likely to contain material information necessary to the defense. T 8/2/07, 11, 14. The court indicated that defense

counsel did not know whether any documents existed which reflected the victim suffered psychotic episodes while she had been a resident of the group home. Id., at 10.

At trial, Dr. Gensterblum testified that the victim was medicated with a very high dose of the anti-psychotic drug Seroquel. His records showed that she had a psychotic episode years before when she had scalded her sister Mia. But since she was living at Manor, she had not had any psychotic episodes. Defense counsel went on to cross-examine Dr. Gensterblum on whether the victim might have had a psychotic episode as the result of missed doses while she was staying with Nakita and her grandmother. The witness could not rule out the possibility that she had a psychotic break, but indicated that it could also have resulted from a traumatic event.

Petitioner's claim concerning medical records is purely speculative. There is no evidence that the prosecutor was in possession of any medical records that showed a history of additional psychotic breaks while DB was a patient at Manor, that would have been favorable to the defense. *Brady* does not impose an affirmative duty upon the government to take action to discover information which it does not possess. *Goff v. Bagley*, 601 F.3d 445, 476 (6th Cir. 2010).

Additionally, in light of Dr. Gensterblum's testimony, there apparently were no psychotic episodes at Manor. Consequently there were no records describing such episodes to discover. Furthermore, Petitioner's defense was that the alleged missed doses might have caused a psychotic episode that led DB to falsely believe she was assaulted. Dr. Gensterblum testified that his staff was very diligent to insure that residents received their medications. Therefore, it is even more unlikely that records from Manor would have

-19-

revealed any similar psychotic episodes brought on by missed medication.

Petitioner has not established that the prosecutor suppressed evidence that was favorable to Petitioner. Nor has he demonstrated that disclosure of the victim's medical records would have created a reasonable probability that the result of the trial would have been more favorable to Petitioner. The claim is without merit.

### IV. Certificate of Appealability

Before Petitioner may appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id*. at 336-37.

The Court concludes that a certificate of appealability is not warranted; reasonable jurists could not debate the Court's assessment of Petitioner's claims. The Court also denies Petitioner permission to proceed on appeal in forma pauperis; an appeal could not be taken in good faith.

**V. Conclusion**

Thee petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED**

**WITH PREJUDICE**.  A certificate of appealability is **DENIED**.  Permission to proceed on

appeal in forma pauperis is **DENIED**.

**IT IS ORDERED.**

                                        S/Victoria A. Roberts
                                        Honorable  Victoria A. Roberts
                                        United States District Judge

Dated: 1/14/2013

| |
|---|
| The undersigned certifies that a copy of this document was served on the attorneys of record and Aaron Clark by electronic means or U.S. Mail on January 14, 2013. |
| S/Carol A. Pinegar |
| Deputy Clerk |